**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

20 AUG 31  AM 11: 18

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| ALTOVISE SHEFFIELD, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CASE NO. CV99-HGD-0252-S |
| | ) | |
| WAL-MART STORES, INC., | ) | |
| | ) | |
| Defendant | ) | |

**ENTERED**

AUG 3 1 2000

## MEMORANDUM OPINION

This matter is before the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b) and Local Rule 72.1(b)(3)(A). Plaintiff, Altovise Sheffield, alleges that she was a victim of sexual harassment and retaliation while employed at a Wal-Mart Store in Homewood, Alabama. She also alleges pendent claims of assault, battery, invasion of privacy, intentional infliction of emotional harm and negligent supervision [Doc. #1]. Defendant, Wal-Mart Stores, Inc., has filed a motion for summary judgment [Doc. # 12] with accompanying brief and evidentiary submissions [Doc. #13]. Plaintiff has responded [Doc. #18] and also filed evidentiary submissions [Doc. #17], and defendant has filed a reply [Doc. #19].

### FACTUAL BACKGROUND

Plaintiff was hired as an hourly associate in the Health and Beauty Aids department of the Wal-Mart Store in Homewood, Alabama, on August 23, 1997. [Sheffield Depo. at 29].

22

When she was hired she underwent orientation and received an Associate Handbook. [*Id.* at 21, 24-25]. The Associate Handbook specifically states that Wal-Mart has a policy prohibiting discrimination of any kind. [Defendant's Exh. D at 9]. It also sets out Wal-Mart's "Open Door" policy. The policy states that if an employee has a problem with discrimination, the employee can go to his or her "coach" (his or her manager or supervisor) about the problem without fear of retaliation. It further states that if the employee is not satisfied with the response, or if his or her coach is the source of the problem, the employee can go to the coach's supervisor. From there, the employee can go up to each level of management without fear of retaliation. [*Id.* at 11].

Plaintiff has testified that she was aware she could take any concern or complaint to any manager in the company. [Sheffield Depo. at 22-23]. She also was aware that, in addition to her own supervisor and the store manager, she had access, through the Open Door policy, to her store manager's supervisors, the district manager and the regional manager.   [*Id.*]

The Associate Handbook also sets out Wal-Mart's policy regarding harassment.   It provides:

> **Harassment of any type, whether sexual, ethnic, racial, etc. is not tolerated at Wal-Mart.**   We want to provide a work environment where everyone is comfortable.  If you, or someone you work with, has been a victim of harassment, you should immediately report the offensive conduct to your immediate supervisor or member of the Coaching team.   You may also contact your Regional/Zone Personnel representative. You can be sure your report will be thoroughly investigated and appropriate action taken.   Confidentiality will be maintained to the extent practical and no retaliation will be taken against associates who report harassment.

2

[Defendant's Exh. D at 14] (emphasis in original).  Sheffield also received computer-based

training regarding sexual harassment and was aware of Wal-Mart's anti-harassment policy.

[Sheffield Depo. at 25-26].

Wal-Mart's Associate Handbook also sets out a "coaching" policy that it follows when

an employee's performance or conduct falls below expectations.  It states:

> If an associate's performance or conduct falls below the
> expectations of his or her position, then the associate is informed
> of the problem and encouraged to take responsibility for his or her
> actions.  This process will include developing a plan of action for
> improving performance to the required level, or changing
> conduct.
>
> There are . . . certain actions of misconduct that may result in
> immediate termination.  Coaching for Improvement will not be
> used to address gross misconduct.  These actions include, but are
> not limited to, the following examples:
> * * * *
> Rude or abusive conduct toward a customer.

[Defendant's Exh. D at 13].

In addition, Sheffield signed a "Customer Service Pledge" that provided she understood

that she was responsible for seeing that every customer received friendly, helpful service and

that, if she was unable to provide good service, she was to call a member of management to

determine how she could satisfy that customer.  [Sheffield Depo. at 27-28].  As a sales associate,

Sheffield reported to her department manager.  [Brooks Depo. at 14-15].

Kushana Exford was a Customer Service Manager (CSM) at the Homewood, Alabama,

Wal-Mart during the time Sheffield was employed there.  [Wells Depo. at 11-12].  CSMs

maintain the front end, checkouts, layaway, and service desk, and handle customer complaints,

3

or other problems that may occur at the front end. [*Id.* at 11]. Exford was responsible for scheduling cashiers, scheduling their breaks and filling in for cashiers during their breaks and lunch hours. She also handled check approvals and assisted with scanning problems. [Pilley Depo. at 45-48]. A CSM is an hourly employee [Pilley Depo. at 34] and is the equivalent of a department manager. [Wells Depo. at 11].

As a CSM, Kushana Exford had the authority to call on sales associates such as plaintiff to work the cash registers on an as-needed basis. [Brooks Depo. at 24-25]. However, this authority was limited to calling on sales associates to work the registers and to scheduling the cashiers' break times and relief. Exford had no other authority over plaintiff or any other sales associate. She had no supervisory authority over the Health and Beauty Aids department or the plaintiff. [Wells Depo. at 62]. She also had no input into or involvement in plaintiff's evaluations and no authority whatsoever to hire or fire anyone at Wal-Mart. Evaluations were performed by assistant managers [Brooks Depo. at 29], while terminations were carried out by salaried members of management. [Pilley Depo. at 37, 45].

Sheffield alleges that Exford sexually harassed her throughout the course of her employment with Wal-Mart by touching her in a sexual and offensive manner and by making lewd comments to her. [Sheffield Depo. at 56-57; Pilley Depo., Exh. 5]. According to Sheffield, on several occasions Exford brushed her body against Sheffield and made efforts to brush against plaintiff's breasts. She also made comments to plaintiff such as "Give me some of your Hershey's kisses" and "I'm just checking out the goods." [Sheffield Depo. at 56-59]. On one

4

occasion Exford laid her head on Sheffield's shoulder. [Id. at 58]. On other occasions, Exford would walk up and touch Sheffield's hand. [Id. at 60].

Sheffield testified that she responded to these actions by telling Exford that she was not interested in her and asking Exford to leave her alone. [Id. at 56, 58-61]. She stated that she eventually responded to Exford's advances very harshly. Sheffield testified that she believes this angered Exford because thereafter, when plaintiff was assigned to work a cash register, Exford would "make it where [plaintiff] couldn't have [her] breaks" and would "make it so [plaintiff] would have to stay" late. [Id. at 62-64]. Plaintiff also asserts that Exford falsely reported that she had been rude to a customer. [Id. at 63].

On February 11, 1999, Assistant Manager Shannon Wells was advised by Kushana Exford that a customer had complained that plaintiff had been rude and had refused to assist him in obtaining an electric toothbrush. [Wells Depo. at 43-44, 48]. Wells asked Sheffield about the incident, and Sheffield stated that the customer had wanted an electric toothbrush that was in the back of the store and she told him she could not get it for him. She then directed him to go to customer service in order to talk to a manager. [Id. at 44; Sheffield Depo. at 34-38]. Shortly thereafter, Kushana Exford came back with the customer and plaintiff again explained why she could not get the toothbrush. According to Sheffield, at this point, the customer was still "angry" and he "stormed off." [Sheffield Depo. at 40].

When asked by Wells why she could not get the toothbrush for him, Sheffield stated that the toothbrush the customer wanted was in a case in the back which was shrink-wrapped (due to remodeling) and locked and that she did not have a key for the case. [Sheffield Depo. at 34-

5

35; Wells Depo. at 44-45]. Wells then asked plaintiff why she did not call a member of management when she was unable to help the customer. Sheffield told Wells that she "just didn't." [Wells Depo. at 45]. Sheffield elucidated this statement, testifying that she did not call a member of management because, "[a]t that time, it was so busy and so hectic and he was so upset until I didn't think to call the management myself." [Sheffield Depo. at 37].

At this point, Wells elected to give plaintiff a "decision-making" day off on her next regularly scheduled work day, February 13, 1998.[1] [Wells Depo. at 53]. The testimony of Wells reflects that she took this action based on the fact that Sheffield admitted to her that she had not taken care of the customer (who had left the store angry) and because of Wells's previous experience with Sheffield. This experience included prior complaints from Sheffield's department manager about her attitude and performance and the fact that Sheffield had received written coaching in January 1998 for being late on 14 occasions. [Wells Depo. at 25-26, 36-37, 57, 74].

Plaintiff was told to return to work on February 14, 1998, with a written plan of action. This plan was to be "a detailed plan of action on what she would do should that type of situation occur again, how she would handle it differently so that the customer would be satisfied." [Wells Depo. at 45-46]. Wells told plaintiff that she had not taken care of a customer and she was given the decision-making day to write out a plan of action to correct it. [Id. at 49, 74].

_____

[1] A "decision-making day" is a step in the Wal-Mart coaching policy short of termination. [See Wells Depo. at 18-23].

6

When Sheffield returned on February 14, she turned in a report, but it was not the plan requested by Wells. Instead, Sheffield wrote a letter of explanation in which she denied that she had been rude to the customer and re-stated her explanation of what had happened when the customer had requested a child's toothbrush. It also was signed by another employee who, Sheffield had previously told Wells, could vouch for her claim that she had not been rude. [See Defendant's Exh. K; Sheffield Depo. at 41-42]. Wells did not talk with other employees who, according to Sheffield, would state that she had not been rude to the customer. [Wells Depo. at 56]. Instead, she told Sheffield that her plan was not acceptable and that she could either write an acceptable plan or she would have to speak with the store manager, Gary Jones. [Sheffield Depo. at 50]. Plaintiff chose the latter.

The following day Sheffield met with Gary Jones. Jones testified that when he sat down with Sheffield to discuss the matter she "got very angry." [Jones Depo. at 14]. She explained to him that she felt like she had not done anything wrong. [Jones Depo. at 14; Sheffield Depo. at 50]. Jones told Sheffield that her plan of action was unacceptable and that she could either write another plan or turn in her badge and smock. Sheffield opted to turn in her badge and smock. [Sheffield Depo. at 53].

At no time during her employment at Wal-Mart did Sheffield tell anyone in management, orally or in writing, that she was being sexually harassed by Exford. [Id. at 59, 66]. Wal-Mart first received notice of plaintiff's allegations of harassment by Exford when it received a copy of Sheffield's EEOC charge of discrimination which she had filed on May 5, 1998. [Defendant's Exh. O; see also Defendant's Exh. N].

7

## LEGAL ANALYSIS

### Sexual Harassment Claim

It is well-established that claims of employment discrimination, including sexual harassment claims, present fact-intensive issues. However, motions for summary judgment or judgment as a matter of law are appropriate to "police the baseline for hostile environment claims." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999) (quoting *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 n. 8 (5th Cir. 1999)).

Title VII provides in relevant part:

> (a) It shall be an unlawful employment practice for an employer--
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2 (1981). Sexual harassment is a form of sex discrimination prohibited by Title VII. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986).

There are two types of judicially recognized sexual harassment cases: (1) *quid pro quo,* which are "based on threats which are carried out" or fulfilled, and (2) hostile environment, which are based on "bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 582 (11th Cir. 2000) (quoting *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 751, 118 S.Ct. 2257, 2264, 141 L.Ed.2d 633 (1998)).

8

The extent of an employer's liability for discriminatory or harassing conduct by an employee depends, to a great degree, on the status of the employee within the company. For instance, when a non-supervisory employee harasses a co-employee, then, if the harassment is such that the employer knows or should know that it is occurring, the employer is liable for the harassment unless it takes prompt action to remedy the problem. *See Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1368, n.4 (11th Cir. 1999). In other words, the employer is liable for employee-on-employee harassment only if it is negligent in discovering or failing to promptly remedy the problem when it comes to its attention. *Ellerth*, 524 U.S. at 758-59, 118 S.Ct. at 2267.

The rules are different if the harassing co-worker is also a supervisor. If the harasser is a supervisor but the harassment has not resulted in "tangible job action," then the employer may nevertheless be held liable if the harassment is sufficiently severe and pervasive to alter the terms and conditions of employment, subject to an affirmative defense set out below. *Ellerth*, 524 U.S. at 751, 118 S.Ct. at 2264. Such cases are, in essence, hostile environment claims. On the other hand, if the supervisor's harassment has resulted in a tangible job action, the employer is vicariously liable for the supervisor's actions and no affirmative defense is available. *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). This is essentially *quid pro quo* discrimination.

9

Determination of Whether Exford is a Supervisor

In the case *sub judice*, no evidence has been submitted that reflects that plaintiff's employer, Wal-Mart, knew or should have known of the alleged harassment by Exford. The alleged instances of harassment were not of such a nature that it should have come to Wal-Mart's attention without being alerted by plaintiff and, by her own admission, plaintiff did not complain about Exford's actions at any time while she was employed at Wal-Mart because she felt she could handle it herself. Therefore, as an initial matter, the Court first must determine whether Exford was a supervisor or a co-employee because an employer's liability for sexual harassment depends upon whether the harasser is the victim's supervisor or merely a co-employee. *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). In Sheffield's case, if Exford is a mere co-employee, Wal-Mart is not liable for her actions.

In determining the extent to which an employer is responsible for the acts of an employee, the United States Supreme Court has determined that an employer is vicariously liable for the actions of an employee if the employee's actions fall under the "aided by agency" rule of the Restatement (Second) of Agency, § 219(2)(d) (1957). That rule states, in pertinent part:

> A master is not subject to liability for the torts of his servants acting outside the scope of their employment unless . . .(d) the servant purported to act or speak on behalf of the principal and there was reliance on apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

*See Faragher*, 524 U.S. at 802-03, 118 S.Ct. at 2290-91.

Thus, an employer is not liable for the torts of its employee acting outside the scope of his employment (unless the employer knew or should have known about the activity) unless the employee was aided in its accomplishment by the existence of the agency relation. Acts of sexual harassment are generally outside the scope of the offending employee's employment. "[A]bsent some elaborate scheme," harassment by a fellow employee having no authority over the victim never can be found to have been "aided by the agency relation." As to such employees, the agency relation provides no "aid" for their conduct but workplace proximity, and that does not suffice for the purpose. *Ellerth*, 524 U.S. at 760, 118 S.Ct. at 2268. For such "unaided" harassment, by whomever done, employers are liable only for their own negligence in failing, after actual or constructive knowledge, to take prompt and adequate action to stop it. *Id.* at 759, 118 S.Ct at 2267. This heightened liability exists because the "acts of supervisors have greater power to alter the environment than acts of co-employees generally. . . ." *Faragher*, 524 U.S. at 805, 118 S.Ct. at 2292.

However, simply because Exford held the position of Customer Service *Manager* does not necessarily imply that she was a supervisor. Courts distinguish between employees who are supervisors merely as a function of nomenclature from those who are entrusted with actual supervisory power. *Parkins*, 163 F.3d at 1033, *citing Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 536 n.19 (7th Cir. 1993) ("If someone in the employer's decision-making hierarchy engages in harassment, the employer may be held liable . . ." but not when the supervisor is at such a low level that he would not be the company's agent).

11

Cases subsequent to *Faragher* and *Ellerth* indicate that whether an individual is "a supervisor with immediate (or successively higher) authority" is dependent upon whether that person's authority was of a substantial magnitude. *Mikels v. City of Durham*, 183 F.3d 323, 331 (4th Cir. 1999) (citation omitted). This authority primarily consists of the power to hire, fire, demote, promote, transfer or discipline an employee. *Id.* Exford had no authority to hire, fire, promote, or transfer plaintiff. She was not involved in plaintiff's evaluation nor did she exercise any other work-related authority over her other than the very limited authority to assign her to a cash register when there was a need.

The inquiry in cases where the supervisory authority of the alleged harasser over the victim is not clear-cut "may have to run deeper into the details of the relationships and particular circumstances." *Id.* at 333. "The determinant is whether as a practical matter his employment relation to the victim was such as to constitute a continuing threat to her employment conditions that made her vulnerable to and defenseless against the particular conduct in ways that comparable conduct by a mere co-worker would not." *Id.*, *citing Faragher*, 524 U.S. at 803, 118 S.Ct. at 2291 (a "victim may well be reluctant to accept the risks of blowing the whistle on a superior..." [and] "generally cannot check a supervisor's abusive conduct the same way that she might deal with abusive conduct from a co-worker."). In these less-clear situations, one circumstance which may be highly probative on the issue of whether any agency authority possessed by the harasser has actually aided his conduct by increasing the victim's sense of vulnerability and defenselessness is the response of the victim herself to the harassing conduct. *Mikels*, 183 F.3d at 333. The Supreme Court noted in *Faragher* that "when

12

a fellow-employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor 'whose power to supervise . . . does not disappear . . . when he chooses to harass through insults and offensive gestures rather than directly with threats of firing or promises of promotion.'" 524 U.S at 803, 118 S.Ct. at 2291 (quoting S. Estrich, *Sex at Work*, 43 Stan. L. Rev. 813, 854 (1991)). Exford, like plaintiff, was an hourly employee. Plaintiff repeatedly told Exford to stop the harassing conduct and got "very harsh" with her when it continued. She never complained to management about it and stated she felt she could handle the problem herself. Sheffield's reaction to Exford's actions, therefore, is more akin to what one would expect between co-employees rather than between an employee and her supervisor.

Considering all these factors, the Court concludes that the limited authority conferred upon Exford was insufficient to make her a supervisor for purposes of *Faragher* and *Ellerth*. Therefore, the analysis used is that for employee-on-employee harassment. Since there is no evidence that Wal-Mart knew or should have known of Exford's harassment or that Exford's accusation was false and designed to harass, it cannot be held liable for Exford's harassment.

### *Quid Pro Quo* Harassment

Even if the Court assumes that Exford was a supervisor, unless the evidence reflects that plaintiff suffered a tangible job action as a consequence of refusing to accede to Exford's implied

13

sexual demands,[2] her claim, at best, is one for creation of a sexually hostile environment by Exford. If so, this would allow Wal-Mart to assert the affirmative defense discussed below.

A tangible job action is one of major consequence, such as hiring, firing, transfer, demotion and the like. See Faragher, 524 U.S. at 790, 118 S.Ct. at 2284. Exford's actions in "mak[ing] it" so plaintiff could not take a break or get off work when she was working a cash register do not qualify. However, plaintiff's termination is a tangible job action. The Court must thus determine if this action was a consequence of plaintiff's refusal to accede to Exford's implied sexual demands.

Assuming as true plaintiff's allegation that Exford fabricated her claim that Sheffield was rude to a customer, the evidence, nevertheless, does not support plaintiff's claim that this false statement resulted in her termination. By her own admission, plaintiff was asked by a customer for an electric toothbrush that was located in the back of the store. She stated that she was too busy to get it and, in any case, was unable to access the case that held the toothbrushes. She admitted that she directed the customer to the customer service desk so that he could find a manager to assist him and failed to call one for him herself, as required by company policy. Plaintiff also admitted that the customer became angry when he was unable to obtain this merchandise and subsequently left the store angry. Sheffield's supervisor, Shannon Wells, decided, after hearing plaintiff's explanation, that the customer had not been properly served by Sheffield and she told her so. Wells then ordered plaintiff to prepare "a detailed plan of

---

[2] Since there is no evidence that Exford made any threats related to any aspect of plaintiff's job, the Court assumes for purposes of this motion that sexual demands were implied by Exford's behavior.

action on what she would do should that type of situation occur again, how she would handle it differently so that the customer would be satisfied." Plaintiff refused to do so because, she asserted, she had not been rude and the situation that developed was not been her fault. However, it is apparent that plaintiff ignored the fact that she was required to call a manager to assist the customer when she was unable to do so. It was primarily this insubordination on plaintiff's part, rather than the assertion that she was rude, that caused Wells to ask plaintiff to prepare a detailed plan. Further, plaintiff easily could have prepared a plan addressing her admitted failure to comply with Wal-Mart's policy of calling a manager to assist the customer, while at the same time maintaining her innocence of the claim that she had been rude.

In addition, this situation with the customer was not one created by Exford out of whole cloth. Plaintiff admits there was a customer who asked her for service that she did not provide and who became angry as a result, eventually leaving the store unsatisfied. Regardless of whether Sheffield was actually rude to the customer, Wells believed she was, believed the situation could have been handled better and asked plaintiff to write up a plan setting out how she thought this could be accomplished. Plaintiff's belief that the situation had not been her fault and that she had not been rude to a customer are irrelevant. *See Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (in employment discrimination case, it is employer's perception of employee's performance that is relevant, not the employee's perception of his own performance). The fact that Wells failed to talk to plaintiff's witness was arguably bad judgment on her part, but she had no knowledge that Exford may have fabricated the claim that plaintiff was rude for discriminatory purposes and plaintiff never informed her otherwise.

15

Plaintiff admitted that all of the actions alleged occurred except that she denied being rude to the customer. Wells thought Sheffield could have handled the situation better, regardless of what plaintiff thought, and ordered her to write up a plan explaining how she could accomplish this should such occasion arise in the future. Plaintiff refused. Although it is plaintiff's privilege to stand by her claim that she was not rude and that the situation was not her fault, she does so at the risk that her employer may terminate her, even though the termination is based on false or faulty information. Although plaintiff's alleged rudeness was a factor in management's decision to require her to submit an acceptable plan of action, it was her refusal to carry out a direct order from her supervisors (to write an acceptable plan) that ultimately caused plaintiff's termination. The fact that the order was based on false information is irrelevant because Wells did not know it was false, Sheffield did not inform her that Exford fabricated this claim to harass her, and plaintiff has provided no authority for the proposition that Wells, given her lack of knowledge, was legally obligated to investigate further. Sheffield's termination was, ultimately, based upon her insubordination. Thus, the connection between plaintiff's termination and Exford's alleged false statement is too tenuous to establish that Sheffield's termination was related to her refusal to put up with Exford's sexual advances.

Further, as noted above, this claim must fail in any case because Exford was not a supervisor as that term is used in *Ellerth* and *Faragher*. Therefore, Wal-Mart's lack of negligence in discovering and addressing this problem shields it from liability for this employee-on-employee harassment.

16

Hostile Environment Claim

Since plaintiff was not subjected to any tangible job action related to her subjection to sexual harassment, any possible liability on the part of Wal-Mart would have to be based on a sexually hostile environment claim. To support a hostile environment claim under Title VII based on harassment by a supervisor, an employee must establish:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza*, 195 F.3d at 1245.

Regarding the case *sub judice*, in addition to challenging Exford's status as a supervisor, defendant asserts that the plaintiff has failed to prove that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. Requiring a plaintiff to prove this element is necessary to ensure that Title VII does not become a mere "general civility code." *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2283-84. This requirement is regarded "as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace–such as male-on-male horseplay or intersexual flirtation–for discriminatory 'conditions of employment.'" *Gupta v. Florida Board of Regents*, 212 F.3d at 583 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998)).

In order to establish this factor, a plaintiff must not only establish that she subjectively perceived the environment as hostile and abusive, but also that such a perception is objectively reasonable; that is, that a reasonable person would perceive the environment to be hostile and abusive. *See Mendoza*, 195 F.3d at 1246; *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2284. Although defendant asserts that plaintiff's failure to report the alleged harassment proves that she did not find her environment to be subjectively hostile and abusive, plaintiff states that she did. Since the evidence in a motion for summary judgment is considered in the light most favorable to the non-moving party, *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), it is assumed that Sheffield, in fact, subjectively perceived her environment to be hostile and abusive.

Regarding the objective prong of this element, the statements and conduct complained of are examined collectively to determine whether they are sufficiently pervasive or severe to constitute sexual harassment. *See Mendoza*, 195 F.3d at 1242. In undertaking this analysis, the Court will assume that the conduct and statements made by Exford were of a sexual nature.[3] When the complained-of conduct or statements are of a sexual or gender-related nature, there are four factors that are considered in determining whether they are sufficiently severe and pervasive from an objective standpoint to alter an employee's terms and conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or merely an offensive utterance; and

---

[3] Before they are considered in determining whether the severe or pervasive requirement is met, the statements and conduct must be of a sexual or gender-related nature. *Mendoza*, 195 F.3d at 1245.

18

(4) whether the conduct unreasonably interferes with the employee's job performance."
*Mendoza*, 195 F.3d at 1246.

Although the actions recounted by plaintiff were undoubtably annoying and offensive, many decisions throughout the circuits have rejected sexual harassment claims based on actions that are as serious or more serious than the conduct at issue here. *See Shepherd v. Comptroller of Public Accounts of Texas*, 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that several instances over a two-year period, including the comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, *touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support a hostile environment claim); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (holding that statement that plaintiff had the "sleekest ass" in the office plus a single incident of "deliberately" touching plaintiff's breasts with some papers that he was holding in his hand were insufficient to alter the terms or conditions of plaintiff's employment); *Adusumilli v. City of Chicago*, 164 F.3d 353, 357 (7th Cir. 1998) (holding actions insufficient to support a hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365-66 (10th Cir. 1997) (holding five sexually-oriented, offensive statements over sixteen months insufficient to show hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you

19

can"); *Hopkins v. Baltimore Gas & Electric Co.*, 77 F.3d 745, 753-54 (4th Cir. 1996) (holding evidence that the male harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding , and stared at him in the bathroom" insufficient to establish Title VII violation); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823-24 (6th Cir. 1997) (reversing jury verdict and finding conduct was "sex-based" but insufficiently severe or pervasive to state actionable claim, where conduct over a four-month period involved repeated sexual jokes; one occasion of looking plaintiff up and down, smiling and stating, "there's nothing I like more in the morning than sticky buns;" suggesting that land area be named as "Titsville" or "Twin Peaks;" asking plaintiff, "Say, weren't you there [at biker bar] Saturday night dancing on tables?"; stating, "Just get the broad to sign it"; telling plaintiff she was "paid great money for a woman"); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (holding plaintiff's claims–that supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blond, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once in a bar and twice at work–were not sufficient for actionable sexual harassment). *See also Indest v. Freeman Decorating*, 164 F.3d at 263 ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long-lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiff's work environment.").

An examination of the factors set out above demonstrates that Sheffield did not endure conduct that was so severe or pervasive that it altered the terms or conditions of her

employment and created a discriminatorily abusive working environment.  Three of the four factors, physically threatening or humiliating conduct, interference with job performance, and severity, clearly are absent from the conduct of Exford established by plaintiff.  To the extent that it has been established, the frequency of the conduct does not compensate for the absence of the other factors.

The instances of Exford brushing up against plaintiff, touching her hand, and looking at her in a manner Sheffield considered sexual in nature are hardly threatening or humiliating. *Compare Hall v. Gus Const. Co.*, 842 F.2d 1010, 1012 (8th Cir. 1988) (sexual harassment established with evidence that, *inter alia,* female employees were held down so that other employees could touch their breasts and legs), with *Black v. Zaring Homes, supra*.  The conduct complained of here simply does not rise to the level of threatening or humiliating conduct envisioned by the courts.  See *Mendoza v. Borden*, 195 F.3d at 1245-49.

Plaintiff also has presented little evidence that these instances interfered with her job performance.  She testified that, when required to work as a cashier, there were occasions when Exford would arrange to make plaintiff have to work beyond the end of her shift, or would make it so that she could not take scheduled bathroom or lunch breaks.  These actions may have made the performance of her duties occasionally uncomfortable, but she has presented no evidence that it significantly affected her actual job performance.  In fact, the only performance appraisal Sheffield received during her employment with Wal-Mart occurred in November 1997, after her first 90 days on the job.  Her overall evaluation was "standard." [Doc. #13, Exh. F].  Although plaintiff testified that she tried to stay away from Exford, there also is no evidence

21

in the record that this effort affected her job performance, especially in light of testimony that reflects that plaintiff worked in the Health and Beauty Aids department and Exford's work as a CSM required that she be stationed primarily at the front of the store. Thus, plaintiff has not shown that Exford's actions unreasonably interfered with her job performance.

Neither are the instances of alleged harassment severe. Even if annoying and offensive, Exford's two statements to plaintiff, and her actions such as staring at Sheffield, touching her hand and brushing up against her on several occasions and laying her head on Sheffield's shoulder on one occasion, are much less severe than the incidents of alleged sexual harassment described and found insufficient by the other courts referenced above, including, for example, the Fourth Circuit in *Hopkins, supra*. The lack of severity of this conduct is evidenced by plaintiff's own testimony that she did not complain about Exford's conduct to Wal-Mart management because she believed she could handle it herself. [Sheffield Depo. at 59].

To the extent that Sheffield's testimony about the "constant" staring, hand touching and brushing up against her establish the frequency factor, this evidence does not create a jury issue on her sexual harassment claim because it is outweighed by the absence of the other three factors. *See Mendoza*, 195 F.3d at 1249. Thus, when viewed objectively, the evidence presented does not provide any support for plaintiff's contention that Exford's actions altered the terms and conditions of her employment such that there existed a pervasive and abusive discriminatory working environment. For this reason, she cannot prevail on her hostile-environment claim.

In addition, even assuming Exford's actions did create a hostile environment, Wal-Mart is entitled to assert the affirmative defense set forth in *Ellerth* and *Faragher* which is available in hostile environment cases where the harassment has not resulted in a tangible job action.  To avoid vicarious liability in such cases the employer must show that (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) the victim had "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *See Ellerth*, 524 U.S. at 765, 118 S.Ct. at 2270; *Faragher*, 524 U.S. at 807,  118 S.Ct. at 2293.

The uncontradicted evidence is that Wal-Mart had an anti-discrimination policy in place which set out steps plaintiff could have taken to obtain assistance from Wal-Mart to "prevent or correct promptly" the alleged harassment.  It also is uncontradicted that plaintiff failed to notify Wal-Mart about any harassment until she filed her EEOC complaint, two months after her termination.  Her only excuse for failing to do so was that she thought she could handle it herself. [Sheffield Depo. at 59].  The Court therefore concludes that plaintiff unreasonably failed to avail herself of the Wal-Mart anti-discrimination grievance procedure. As a result, Wal-Mart cannot be held liable for Exford's actions toward plaintiff while acting as a customer service manager.

In summary, the Court concludes that Kushana Exford was not a supervisor as that term is used in *Ellerth* and *Faragher*.  Wal-Mart did not act negligently regarding Exford's conduct because it neither knew nor should have known about it.  Even assuming Exford to be a supervisor, her harassment of plaintiff did not directly result in a tangible job action, nor did it

23

create a hostile working environment.  Nonetheless, to the extent that Exford's actions could have been construed as creating a hostile work environment, Wal-Mart exercised reasonable care to prevent and correct promptly any sexually harassing behavior as evidenced by its sexual harassment and anti-discrimination policy and procedures, and plaintiff unreasonably failed to take advantage of these preventive and corrective opportunities or to otherwise avoid harm. Therefore, defendant's Motion for Summary Judgment as to Count One of plaintiff's complaint is due to be granted.

**Retaliation Claim**

In Count Two of her complaint, plaintiff alleges that Wal-Mart retaliated against her for objecting to the conduct of Kushana Exford.  A plaintiff alleging a retaliation claim under Title VII must begin by establishing a *prima facie* case.  The plaintiff must show that (1) she engaged in statutorily protected activity; (2) an adverse employment action occurred; and (3) the adverse action was causally related to the plaintiff's protected activities.  *Coutu v. Martin County Board of County Commissioners*, 47 F.3d 1068, 1074 (11th Cir. 1995).

Plaintiff asserts that she engaged in statutorily protected activity when she told Exford not to touch her anymore and that she was not interested in that kind of relationship.  However, an employee's opposition to sexually harassing behavior by a co-worker would be protected conduct, for purposes of his Title VII retaliation claim, only if the co-worker's conduct could be attributed to the employer.  *Id*.  As discussed above, Exford was plaintiff's co-worker, not a supervisor of such high standing sufficient for her to be considered an agent of Wal-Mart.

24

Plaintiff admits that she did not otherwise complain of Exford's actions at any time while she was employed by Wal-Mart.  Under these facts, plaintiff's complaints to Exford do not constitute statutorily protected activity.

In addition, for the same reasons cited above, plaintiff has failed to show that her termination was causally connected to her alleged statutorily protected activity.  Plaintiff was told to submit a plan of action concerning her run-in with a customer.  She presented a letter defending her actions rather than a plan of how she would handle the situation differently in the future.  She may have considered this a plan as requested, but her employer found it inadequate and directed her to write another one.  She refused.  Thus, plaintiff was terminated for insubordination, not for being rude to a customer.  Therefore, plaintiff cannot show that her protected activity was causally connected to her termination.

Based on the findings outlined above, the Court finds that defendant's Motion for Summary Judgment as to Count Two is due to be granted.

**State Law Claims**

In addition to her Title VII sexual harassment and retaliation claims, plaintiff also has asserted state law claims for invasion of privacy, assault, battery, intentional infliction of emotional harm, and negligent supervision.  In Alabama, an employer is liable for the intentional torts of its employee if (1) the employee's acts are committed in furtherance of the business of the employer; (2) the employee's acts are within the line and scope of his employment; or

25

(3) the employer participated in, authorized, or ratified the tortious conduct. *Moman v. Gregerson's Foods, Inc.*, 570 So.2d 1215, 1216 (Ala. 1990).

Plaintiff asserts that, because Wal-Mart terminated her, it ratified the acts committed by Exford. However, the law in Alabama holds that an employer can only be found to have ratified the employee's conduct if it is found to have actual knowledge of the alleged conduct. *Moman*, 570 So.2d at 1216; *Sparks v. Regional Medical Center Board*, 792 F.Supp. 735, 748 (N.D. Ala. 1992). As is noted several times above, plaintiff never told anyone in Wal-Mart's management of the alleged harassment by Exford until she filed her EEOC complaint two months after her termination. This is insufficient as a matter of law to establish Wal-Mart's knowledge of Exford's conduct.

Likewise, there is no evidence to support plaintiff's claim of negligent supervision. Therefore, defendant's Motion for Summary Judgment as to plaintiff's state law claims is due to be granted.

A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this ___30th___ day of ___August___, 2000.

_____
HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE

26